## WILSON v. GIRAUD.    (No. 3007.)

(Supreme Court of Texas.    June 1, 1921.)

1. Evidence ⟺429—Oral, evidence showing inconsistencies held not inadmissible as contradicting field notes.

In proceedings involving boundaries, oral evidence is admissible as against the objection that it contradicts the written field notes where it tends to show that the calls in the field notes are inconsistent, and to show which call is true and which is false.

2. Boundaries ⟺37(1)—Evidence held to show that land was part of certain surveys as located on the ground.

In a proceeding to determine boundaries where surveys, as indicated by the field notes, were conflicting, *held* that evidence conclusively showed that the land in controversy was part of certain surveys as they were actually located on the ground in 1874.

3. Boundaries ⟺10—Reasonable construction of field notes harmonizing terms of patent will be adopted.

A reasonable construction of field notes which harmonizes all the terms of the patent will be adopted.

4. Boundaries ⟺3(1)—When all calls cannot be followed, as few should be disregarded as possible.

In determining boundaries, when all the calls cannot be followed, as few should be disregarded as possible.

5. Public lands ⟺176(2)—Descriptive matter inserted by mistake should be rejected.

In an ambiguous grant, such matters of description as clearly appear to have been inserted by mistake should be rejected.

Certified Questions from Court of Civil Appeals of First Supreme Judicial District.

Proceeding between J. W. Wilson and E. A. Giraud. Judgment for the latter was reversed by the Court of Civil Appeals, a rehearing granted, and questions certified. Questions answered.

E. P. & Otis K. Hamblen, of Houston, for appellant.

Baker, Botts, Parker & Garwood, of Houston, for appellee.

### Certified Questions.

GREENWOOD, J. The certificate of the honorable Court of Civil Appeals is as follows:

"To the Honorable Supreme Court:

"By an opinion filed by us in this case on the 10th day of November, 1916, a certified copy of which accompanies this certificate, we reversed the judgment of the trial court in favor of appellee Giraud, and rendered judgment for appellant Wilson.

"On the 25th day of November, 1916, appellee filed his motion for rehearing, which was,

by a majority of this court, refused, Mr. Chief Justice Pleasants dissenting.

"Entertaining doubts as to the correctness of our opinion since the order refusing the motion for rehearing was entered, we have, on our own motion, set aside the order refusing the motion, and the cause is now pending before this court on motion for rehearing. Inasmuch as we now entertain doubts as to the correctness of our original opinion, we deem it advisable to certify to your honors, under article 1619, Vernon's Sayles' Civil Statutes, the questions hereinafter set out, upon the following statement of facts:

"On the 10th day of August, 1824, the Wm. Bloodgood league of land in Harris county was surveyed and located. Beginning at its northeast corner it runs south 9½° east 5,000 varas, to a post and mound in the prairie for its southeast corner; thence south 80½°· west, at 3,000 varas timber, at 3,500 varas Cedar bayou, at 5,000 varas to a post in prairie for its southwest corner; thence north 9½° west 5,000 varas to a post from which an elm marked 'W. B.' bears north 50° west 1 vara, a water oak marked 'W. B.' bears south 25° west 6 varas, for its northwest corner; thence north 80½° east 5,000 varas, to place of beginning.

"Thereafter a group of surveys were made which call for connection with the lines of the Wm. Bloodgood as follows:

"The George Ellis league was surveyed and located by surveyor George M. Patrick on the 17th day of August, 1835. By its locative field notes it begins at a stake and mound on the west bank of Cedar bayou, on the north line of the Bloodgood league, to run thence with Bloodgood's north line south 80½° west 950 varas to Bloodgood's northwest corner; thence with Bloodgood's west line south 9½° east 560 varas prairie, 3,400 varas a stake and mound on Bloodgood's west line in prairie for its southeast corner; thence south 80½° west 4,827 varas to a stake and mound in prairie for its southwest corner; thence north 9½° west 5,000 varas to a stake in prairie for its northwest corner; thence north 80½° east 4,777 varas, a stake on the west bank of Cedar bayou for its northwest corner; thence down said bayou with its meanders to place of beginning.

"The Benjamin Barrow survey was surveyed and located by George M. Patrick, the same surveyor who located the George Ellis in 1835, and in the same year. By its locative field notes it is described as follows:

"'Beginning at a stake on the west bank of Cedar bayou and on the south line of a league of land granted to William Bloodgood, from which a pine 10 inches diameter bears north 70° east distant 8.5 varas, and an elm 8 inches in diameter bears south 60° east distant 4 varas; thence with said Bloodgood's line south 80° 30″ west 4,000 varas stake and mound in prairie for N. W. corner; thence south 9° 30″ west 1,490 varas, set stake and raised mound in prairie for S. W. corner; thence north 80° east 4,230 varas to the bank of said Cedar bayou, corners on three small pin oaks from which another pin oak 8 inches in diameter bears south 35° west distant 5.5 varas, and a pine 30 inches diameter bears north 11° west distant 10.4 varas; thence up said Cedar bayou with its meanders to the place of beginning.'

"On the 23d day of December, 1874, J. J. Gillespie surveyed and located for Ashbel Smith a tract of land which was thereafter patented to him. By its locative field notes it is described as follows:

"'Beginning at a stake on the north line of B. Barrow's ¼ league survey 1,500 varas from Cedar bayou in prairie; thence north 9½° west 1,600 varas with the west line of the Wm. Bloodgood league to stake in prairie, the S. E. corner of George Ellis league; thence south 80½° west with the south line of George Ellis 1,471 varas to a stake in prairie; thence south 9½° east 1,600 varas to a stake in said Barrow's north line; thence north 80½° east 1,471 varas with Barrow's line to the beginning.'

"On the 23d day of December, 1874, J. J. Gillespie surveyed and located for Ashbel Smith, assignee of William Ritchie, a tract of land, which was thereafter patented to Ashbel Smith on the 13th day of December, 1877. By its locative field notes it is described as follows:

"'Beginning at a stake in the north line of Benjamin Barrow's ¼-league survey, being 2,971 varas from Cedar bayou; thence north 9½° west along the western boundary of Ashbel Smith's survey 1,600 varas to a stake in prairie in the south line of George Ellis league; thence south 80½° west along said south line of Ellis league 1,256 varas to a stake in said line in the prairie; thence south 9½° east 1,600 varas to a stake in H. F. Gillett's north line 227 varas from Barrow's N. W. corner and the N. E. corner of said Gillett's survey; thence north 80½° east along said Gillett's and Barrow's north lines to place of beginning, 1,256 varas, containing 356 acres.'

"On the ―――― day of September, 1886, J. J. Gillespie, who surveyed and located the two Ashbel Smith surveys in 1874, surveyed and located the Martha Mings survey, which is described as follows:

"'Beginning at the most southerly S. E. corner of land grant of Geo. Ellis, stake corner in prairie; thence north 9½° west 3,400 varas to corner in prairie, in inner southeast corner of said Ellis; thence north 80½° east 550 varas to corner in prairie on northwest corner of Wm. Bloodgood's league survey; thence south 9½° east 4,093 varas, the northeast corner of survey in name of A. Smith on Bloodgood's west line; thence south 80½° west 2,512 varas to corner in prairie, Wm. Ritchie's north line; thence north 9½° west 693 varas to corner in prairie south line of said George Ellis; thence north 80½° east 1,963 varas to the beginning.'

"For a better understanding of the location of these several surveys and their relation one to the other, your honors are referred to maps A and B in certified copy of our original opinion, which accompanies this certificate.

"Appellee made application for the purchase of the Mings survey on November 8, 1907, and on November 21, 1907, the application was approved and the land sold him by the commissioner of the land office in accordance with the statute regulating the sale of public lands.

"Appellant has title to 575 acres of land off of the north ends of the Smith and Ritchie sur-

veys. This 575 acres is described as follows in the deed under which appellant acquired title:

" 'Beginning 7 varas from the northeast corner of the Ashbel Smith survey, patent No. 288, vol. 29, on the west side of the county road, on the south line of the George Ellis league; thence south 9½° east 1,193 varas along the west side of said road to the northeast corner of 400 acres conveyed by Ruby to Porter; thence south 80½° west 2,770 varas to said Porter's northwest corner on the west line of the said Ritchie survey; thence north 9½° west 1,193 varas to the northwest corner of the said Ritchie survey, on the south line of the George Ellis league; thence north 80½° east 2,770 varas to the place of beginning.'

"It is apparent from the field notes of appellant's land that his boundaries conflict with the Mings survey owned by appellee, if the north lines of the Smith and Ritchie surveys, as actually located on the ground, are identical with the south line of the George Ellis survey, as the calls in the field notes of the Smith and Ritchie before set out indicate. The true location of the Smith and Ritchie surveys depends upon the true location of the north line of the Benjamin Barrow survey.

"S. J. Sjolander, witness for appellee, testified that he moved into the neighborhood where the Benjamin Barrow survey is located in 1871 (36 years after the Barrow was located); that he had lived there ever since, a period of 41 years; that he is acquainted with the north boundary line of the Barrow survey; that he lived on the Wm. Bloodgood league, perhaps 700, 800 or 1,000 yards, something like that, from the Barrow north boundary line; that the north line of the Barrow survey was fenced by Rosamond, Milam & Bro., in about 1878 or 1879, something like that; that before that fence was constructed he had seen and known and was familiar with the north boundary line of the Barrow survey; that he cut wood on both sides of the line, and always tried to avoid cutting line trees. He further testified:

" 'I knew Mr. J. J. Gillespie, a surveyor, many years ago. The north line of the Benjamin Barrow survey was always considered to start at a little gully down on the bayou, right opposite the Armstrong survey in Chambers county; there is where they always got their line down there, and I remember when Mr. Gillespie was there surveying that he run across certain lines there to get that line, and when he struck this place, always considered that was the line. There were some elm trees, as near as I can remember, on the bank of the gully, right on the bank of the gully almost, that had surveying marks on it; if I remember right, it was cuts and a cross on this little elm, and further out, through the timber, there was small pine trees, some scattering oaks, and you could see the hacks along there, and that is what we were guided by in wood chopping.

" 'I know Mr. P. G. Omohundro. I have seen him in that vicinity, saw him there a couple of months ago, doing some surveying down there. I did not point out to him any marks or lines of any surveys of land; I found him on the line of the Benjamin Barrow tract, lower end of it, on the north line; this line upon which Omohundro was at the time I saw him is the north line of the Benjamin Barrow survey about which I have been testifying. It was the line I spoke of as having been marked through the timber there, and known by reputation in that neighborhood as the north line of the Benjamin Barrow, where the fence is placed to-day. I spoke about Mr. J. J. Gillespie being out there doing some surveying, and that I left him on the bayou; Mr. Omohundro was virtually in the same place that Mr. Gillespie was at the time I saw Mr. Gillespie.'

"Mr. Omohundro testified: 'I went to that point (the northwest corner of the Armstrong survey), and picked up my work at that point on the bank of Cedar bayou, on the west side of it on the line which, produced west, would be a prolongation of the Armstrong, and I measured that distance and ran that line which has the correct bearing as given in the Benjamin Barrow notes, south 80½° west; all these latter surveys ran at that, apparently. Mr. Sjolander was with me at the time, and I asked him if he recognized that as the Barrow line, and he said he knew it was, and measurements as made from there are as shown on this map here as the north line of the Benjamin Barrow.'

"This witness further testified: 'With reference to the northwest corner of the Bloodgood, I found the original oak and the original elm called for at that point represented on the map in red; that corner, I would like to get my notes on that, so as to be exact, I went to the accepted northwest corner of the Bloodgood league from which an old oak marked X bears south 40½° west 12½ varas, and ran north 58¾° west 115½ varas; the reason I ran on a different course, I had already found the corner, and it is indicated here by the red circle; at that point there was an elm 19 inches in diameter, with very old marks, bears north 50° west 1 vara, and an old water oak 25 inches in diameter, with evidence of W. B. marked on it, bears south 25° west 6 varas; this elm is broken off, and a snag stands five feet from the ground, and the oak is also broken off, and stands 7½ feet high.'

"It was also shown that many years ago the then owner of the Ritchie survey sold a small tract of land out of the southern portion thereof, describing it as beginning on the north line of the Barrow, and that the purchaser, in fencing this tract, recognized the line described by the witnesses Sjolander and Omohundro as the north line of the Barrow.

"There is no testimony showing any marked line along the south line or extending west from the S. W. corner of the Bloodgood, and no testimony showing the bearing trees from the beginning corner of the Barrow in the south line of the Bloodgood as called for in Barrow field notes. The line described by the witnesses Sjolander and Omohundro as the north line of the Barrow is 702 varas south of the south line of the Bloodgood.

"Upon these facts we respectfully certify for your determination the following questions:

"First. Was the testimony of the witnesses Sjolander and Omohundro tending to show that the true north boundary line of the Barrow survey was not tied to, and did not run for a distance with, the Bloodgood south boundary line, as called for in the field notes by which it was located, but that, as a fact, it is located 702 varas south of Bloodgood's south boundary

line, admissible over the objection that it contradicted the written field notes of the survey?

"Second. Was the evidence above set out sufficient to sustain the finding of the jury that the 575 acres of land in controversy was not in conflict with the Smith and Ritchie surveys as those surveys were actually located upon the ground in 1874?"

The following are the maps referred to in the certificate:

as running south 80° 30" west from a stake for beginning corner, which was described as follows: First, as being at the point of intersection of the west bank of Cedar bayou with the south line of the league granted by William Bloodgood; and second, as being at a point from which a pine 10 inches in diameter bears north 70° east at a distance of 8.5 varas, and from which an elm 8 inches in

[1] We answer that the testimony of the witnesses Sjolander and Omohundro was admissible over the objection that said testimony contradicted the written field notes of the Barrow survey. The written field notes identified the north boundary line of the Barrow

diameter bears south 60° east at a distance of 4 varas.

The testimony of Sjolander and Omohundro tended to show that the elm tree called for in the field notes was not at a distance of 4 varas, on a course south 60° east, from

where the west bank of Cedar bayou intersected the south line of the William Bloodgood league, but instead that it was at almost the point of intersection of the west bank of Cedar bayou with the south line of the William Bloodgood 7½ labors. The points of intersection of the west bank of the bayou with the south line of the Bloodgood league and with the south line of the Bloodgood 7½ labors were 702 varas apart, and hence the testimony objected to tended to show that the calls in the field notes were inconsistent.

Once testimony is adduced to establish an inconsistency in field notes, parol evidence which throws light upon which call is true and which call is false is admissible. The purpose of admitting the parol evidence is not to override that which is written, but to properly interpret it. Where it is impossible to give effect to all that is written, effect will be given to that which may be found to be true.

The testimony as to the marked line on a course south 80½° west from the intersection of the bayou with the south line of the Bloodgood 7½-labor survey, and as to the recognition of that line, and as to the absence of marks along the designated course from the intersection of the bayou with the south line of the Bloodgood league, was all admissible on the inquiry as to what part of the description in the Barrow field notes was true and what part was false.

In Duren v. Presberry, 25 Tex. 517, a call for bearing trees was held to control as against a call for the corner of an adjacent survey, where no such bearing trees were found at the corner of the adjacent survey, and no marked line led therefrom, and where a marked line, running on the specified course, and the bearing trees, which were called for, were found 1,000 varas to the north. In delivering the court's opinion, Chief Justice Wheeler said:

"We know of no rule for the construction of grants which would give a controlling influence to a call for the corner of a survey over a call for bearing trees and marked lines, which are found upon the ground to correspond with the calls. * * * What distinguishes this case from Anderson v. Stamps, 19 Tex., is that there are calls in the patent which correspond with objects found upon the ground. The correspondence of the bearing trees with the calls in the grant, and the marked line running to the second corner of the survey, render it reasonably certain, we think, that the point where these objects are found is the true beginning corner of the survey, and that the call for the southwest corner of the Brooks Williams league, is a mistake."

[2] While the evidence was sufficient to support the finding that the true north line of the Barrow was 702 varas south of the south line of the Bloodgood league yet the evidence was conclusive that the land in controversy was a part of the Smith and Ritchie surveys as located upon the ground in 1874.

[3] Apart from course and distance, the field notes identify the land patented to Smith by reference to the north line of the B. Barrow survey, the west line of the Wm. Bloodgood league, the S. E. corner of the George Ellis league, and the south line of the George Ellis league. To construe the call for the north line of the B. Barrow survey as a call for that line at a distance of 702 varas south of the south line of the William Bloodgood league is to make the call repugnant to every call in the Smith patent, except the calls for course and distance. By construing the call for the north line of the B. Barrow survey as a call for that line as it was at the time designated on the official maps, and as the Barrow field notes pointed to its location by the call to run with the south line of the Bloodgood league, is to prevent any repugnancy between the calls of the Smith patent. The latter construction is reasonable, and, since it harmonizes all the terms of the patent, it must be adopted under the general rule for the interpretation of written instruments.

[4] If, however, it were impossible to reasonably so interpret the patent as to prevent the disregard of any of the calls, we would still have no hesitancy in rejecting the call for the Barrow north line. In determining boundaries, when all the calls cannot be followed, as few should be disregarded as possible. Hill v. Smith, 6 Tex. Civ. App. 312, 25 S. W. 1083. Therefore, if we had to disregard either the call for the Barrow north line or the calls for the Bloodgood west line, the Ellis southeast corner, and the Ellis south line, the call for the Barrow north line would be disregarded.

[5] The call for the Barrow north line if repugnant to the other calls, would be the call to be ignored, under the rule which rejects such matters of description in an ambiguous grant, as clearly appear to have been inserted by mistake, and which gives controlling effect to such matters as seem certain and "most consistent with the intention to be derived from the entire description." Hubert v. Bartlett, 9 Tex. 104; Finberg v. Gilbert, 104 Tex. 547, 141 S. W. 82; Lilly v. Blum, 70 Tex. 712, 6 S. W. 279; Harrell v. Morris, 5 S. W. 626, 627.

There is no substantial difference in the Ritchie and Smith field notes, in so far as concerns the application of the principles we have announced. If the Smith survey extends to the south line of the Ellis league, no one questions that the Ritchie does also.

We answer to the second question that the land in controversy was conclusively shown to be a part of the Smith and Ritchie sur-

veys, and included in the patents to Ashbel Smith, and that the testimony of Sjolander and Omohundro did not warrant a contrary finding.